The next switch is the Unite  Good morning, and may it please the court. My name is Seth Ginsberg, and I appear on behalf of Adoni Nina. Mr. Nina right now is sitting in a federal penitentiary in Pennsylvania. He's serving three life sentences plus 30 years. And I suggest that the sentence in this case alone warrants that we take a closer look at how we got here. Because I fear that this is a case where the ends have been allowed to justify the means. There's no dispute that the tragic and untimely death of the young woman, Aisha Morales, is something that is regrettable and should have been avoided. But the collective desire for retribution should not allow us to bend the law to achieve that goal. The law being bent is bringing it to federal court rather than state court. That's the, it's not a question of the law was bent to reach a conviction that was otherwise not appropriate, at least on your principle. You have other arguments, but on your principle issue, it's a question of federal jurisdiction. That's exactly right, Your Honor, and I believe- I thought you were arguing the substantive reasonableness of the sentence in this case when you started off. Is that right? That is an argument that's on appeal as well, Your Honor. That seems to be the pitch that you made, that he got all this time. But apart from the facts of this case, which we'll talk about, he was a criminal history category six at his sentencing, right? That's correct. And he had prior convictions for armed robbery, firearms, assault, and others. So he had a very considerable criminal history score before this case even started. No doubt. Well, that's interesting, because I thought your primary focus was on a substantive law, essentially suggesting that the killing was not in relationship necessarily to the underlying drug offenses. And as a result, should not be falling within the relevant statute. I thought that was your main argument. Is that not right? You are all correct, and you can see how much fun I had writing this brief. It's a very unusual case, as I think procedurally even. There were two trials on a single indictment, although superseded, I think, 12 times. And a single sentence that incorporated the verdicts at both trials. The sentence, as I mentioned, is a life sentence on a drug conspiracy with a concurrent life sentence on a murder connected to the drug conspiracy. And a third consecutive life sentence on the same murder connected to the same drug conspiracy under a different theory, plus 30 years on firearms charges. I think that fundamentally, this is an issue of jurisdiction. In that, I think that the desire to achieve retribution here. Never mind the desire. Just tell us why it's not properly connected to the drug conspiracy. That's your argument. Let's get to it. It's not properly connected to the drug conspiracy, because the killing here was the result of a personal dispute between the shooter. Now, aren't you ignoring the cause of that dispute? I'm not, Your Honor. Well, because I thought the cause of the dispute was that the shooter had a dispute with Bobby Morales, unrelated, over drug territory. And then the relatives of Bobby Morales, these other women, came back at Kathy Morales because of her perceived harassment or whatever of Bobby. Isn't that what the beef was? That's largely correct. The dispute was between Kathy Morales and a person named William Vieira. And she was using Bobby Morales as a go-between to deliver messages to Vieira. And Bobby's sister Desiree was displeased with this. But the dispute with Vieira was overselling in the crew's drug territory, right? That's correct. How's it not connected? Didn't your client give her the gun and stood there while she shot her? In a but-for sense, I suppose you could argue that it's connected. But in a proximate sense, I disagree. From Mr. Nina's perspective, there's no evidence that he had any knowledge that Ms. Morales, Kathy Morales, the shooter, was involved in a drug dispute with Mr. Vieira or Bobby Morales. There's no evidence that he had any knowledge that Ms. Morales used Bobby Morales as a go-between to deliver messages. There's no evidence that Mr. Nina had any knowledge that Bobby Morales and these young women with whom Ms. Morales engaged in this assault and this fight. She went to him to get a gun, right? What did she say when she went to him to get, yes. But the gun itself is part of the drug conspiracy. Is there not evidence that there are guns that are part of what the crew has? There is evidence that the crew has guns, but in this particular, see that's- He then said, are you going to do it or am I? Why would he do it? I would like to answer that question, but can I do it with a little context? Sure. That's exactly the problem that happened here, your honor. This case was tried with a very broad brush of, these are violent people, there's drug dealing. Everything they do is connected to this drug dispute, this drug business. And so, if there's a shooting, it's related to the drug dispute. If a shooting results in a death, it's related to the drug dispute. Ms. Morales and Mr. Nina were involved in a sexual relationship. They had a boyfriend and girlfriend. She was badly and publicly beaten by three young women. She got, when the dust settled and she got up, she said on the phone to Mr. Nina, they jumped me. She said why she wanted to shoot them, because they jumped me. She went back to Mr. Nina and she got a gun. This was argued to the jury, and the jury was able to draw conclusions based on all the evidence about whether this was how proximately caused. Because as you said yourself, it's in a but-for sense related. And it's just a judgment call really, I suppose, as to how are we going to assess that. And isn't that a call for the jury to make as to whether a shooting that results from a beating, that results from a beef, that is all at the bottom about drug territory, is sufficiently related or not? With due respect to trial counsel, that argument was not really made. Trial counsel attempted to argue that it was related to some other motive that had been disavowed at trial. This argument was not presented to the jury, and I think it's a legal argument. I don't think it's a factual argument, because you have Mr. Nina's knowledge of what transpired here, and the evidence totally lacking that he knew that there was a drug dispute between Morales and these other men. That the women with whom she was fighting had any connection to these other men. And you have a witness, a person who saw what happened. Michael Santana, a cooperating witness, who was Kathy Morales', the shooter's, ex-boyfriend. He was there, he followed her back to Mr. Nina, and what did he say? He said, I pleaded with Kathy to think about our child and not do this. Why was he pleading to Kathy? Why not to Mr. Nina? He's the one that's supposedly controlling this. If this is a drug related thing, in furtherance of their drug business, why wouldn't he say, Nina, don't let her do this. Please, don't make her do this. Maybe he thought that she was maybe more responsive to that kind of argument. It's her child and the boyfriend's child that's being talked about. I mean, these are just factual inferences one way or the other that can be drawn in different directions. But respectfully, I don't think there are any factual inferences that can be drawn that demonstrate that Mr. Nina had any knowledge that the underlying dispute was related to drugs, that Kathy's desire for revenge was related to drugs. Wasn't that the argument that Nina's counsel made, that is essentially, that this is not related to drug activity. This is related to this personal dispute between these two people. So that was, in fact, related to the jury. That was the primary defense, I thought, and that was rejected. And so, I guess my question is, where do you go from there? Well, I think two things. First of all, that was sort of related to the jury. The young women who were part of this fight had initially lied to the police and that was why this shooting occurred, and then they came back later and told the government, no, no, we were afraid of telling the police this was really about drugs. And so, the argument at trial was they didn't really lie, they told the truth the first time. But that goes into the other issue that's before the court, one of the other issues, which was the admission of the other violent activity that occurred, and I think- You're essentially arguing that there is a mens rea requirement with respect to the federal jurisdictional element. Have we ever held that? In other words, if somebody intentionally engages in a killing that is ultimately traceable to a drug business, and the drug business is what makes it a federal crime, is there a case that says that there is no federal jurisdiction, it is not this federal crime, unless the person doing the killing knows that it's a drug killing? Not in those words precisely, but yes, the law says that a motive has to be related to the drug business. And that's, I think, motive equates in that construct to mens rea. And there has to be meaningfully related, meaningfully related, not just tangentially related, not just- But whose motive? In other words, if someone like Mr. Nina, who's the head of a drug organization, hires somebody else to do a killing, and Mr. Nina knows that it's about drugs, but the hit man doesn't. He doesn't care, he's just getting his money. And I suppose there could be a different federal statute that might apply there. But if they prosecuted the hit man under this statute, you're saying he would not be guilty because he didn't know? Or if somebody assists in a murder that the accomplice does not know is motivated by the drug trade, but the principal who does the killing knows that it's a drug killing, and it is a drug killing. You're saying that the accomplice is not guilty of a federal crime, would have to be separately prosecuted in state court because he lacked, he personally, the accomplice, lacked the motive to further a drug enterprise. That's an interesting question. I think- That's the question in this case, isn't it? because that's what Mr. Nina is. He is an accomplice to the extent that he supports, assists in the shooting. And if, as you've suggested, the underlying beef here is a drug beef, you're saying Mr. Nina cannot be convicted in federal court of participating in that murder that is connected to the drug trade. And in furtherance of a drug trade that is in fact his crew, that there has to be proof beyond a reasonable doubt that he understood all the reasons why his crew member wanted to kill this person. I think that's right. I think that he has to know that this is meaningfully related to the drug business. That's the theory on which the government tried the case. They didn't try the case on the idea that he tangentially was involved. They tried the case that he was a person who enforced his rule through violence. And they did it by introducing the acts of his underlings, which by the way, when they were cross-examined and questioned, they never once said, Nina told me to do it. They argued to the jury that Nina told them to do it, but the testimony- They charged dating and betting too, right, for that homicide? They did charge it, but they didn't argue it. Was it charged to the jury at anybody? Yes, incorrectly, but yes, they did charge it to the jury. You wanted some additional time to talk about the three other acts that were admitted, is that right? Yes, if the court. So the three other acts that were admitted, I think, play into the bigger picture here, because those three other acts were, just as with the killing of Aisha, primarily motivated by perceived personal affronts. And in each instance, you have a person named Julio Panetto, who was a cooperating witness and the supposed muscle behind the group, who testified that he committed these personal acts. Now, pre-trial, the government said to the district court judge, we're going to have witnesses that are going to come here and say this was done to solidify control and project strength, but that's not in fact what the witnesses ended up saying. And what they said, with respect to Mr. Nina, was in one instance, they approached Mr. Nina to obtain a gun again and said, well, this Christopher, he wants to go and shoot these people that shot at him. And what did Mr. Nina say? If that's what he want to do, let him do it. He wasn't directing it, he didn't initiate it, he didn't control it. You have this so-called Kojak shooting. You have an individual who's acting up on the block. He's behaving in a violent, disrespectful, threatening manner. What does Mr. Nina do? He leaves. He's personally confronted by this person. He says to the guy, you're not crazy. Basically, get out of my face. And he leaves. He doesn't shoot the person. He doesn't tell anybody else, as soon as I'm gone, shoot the person. You have this bicycle incident, where a bicycle is stolen, and the crew members go and get this bicycle, and then one of them is aggravated that his bike was stolen, and he wants to go back and shoot at these people. And that's what happens. And- It's clear that violence is very much a part of this conspiracy, at least as pled by the government. And don't you think that in a conspiracy which involves this level of violence and intimidation, the government should be able to introduce evidence to suggest that there is this level of intimidation, and it becomes fairly fundamental to the existence of the conspiracy, and the operation of the conspiracy, because in fact, it is used to control, in this particular case, the block. I think that's exactly right, and I think that that should be permissible. What I think happened here, however, is that you have these disparate acts that really were not connected to the conspiracy. They were using the bicycles to sell drugs and to alert the presence of authorities. That was part of the operation. At least there was testimony to that fact, right? Yes, I understand. The bicycles were a very sophisticated counterintelligence tool that these people were using to drive. These are 16, 17, 18 year old kids, basically, riding around the neighborhoods on their bicycles. When one of these bicycles gets stolen and they say, hey, we want our bike back, all of a sudden it becomes, this is an instrumentality of the crime and we're going after them. I mean, I think there's got to be some time when you kind of pull the curtain back and look and say, what was really going on here? What was this really part of a drug conspiracy? Or is it, I get it, we have a dead girl here and that's a really terrible thing. The argument all the time, and I'm certainly happy to acknowledge that it sometimes may seem strained, that these people who run drug organizations need to enforce their will. They need to protect the people who work for them. They need to throw their weight around if they're going to conduct an illegal business. After all, they can't get a lawyer and sue people who steal their bicycles that they use for their drug trade. So they make that argument all the time, and it may get a little boring to us to hear. But isn't it for the jury to decide if that is true? Because after all, is it not in fact true as a general matter that that is so? And the government puts it to the jury that that is so in this case, and the jury makes its call. Yes, but in the first instance, the district court let the evidence in when I believe it should not have because it was not sufficiently tethered. But if the jury could make that call based on this evidence, then is that not relevant evidence that the judge had the discretion to allow? You're saying it's more prejudicial than probative, or something like that? Forgive me, I don't mean to be disrespectful. I'm excited. No, they weren't permitted to make that call, Your Honor. The defense counsel couldn't stand there and argue that this evidence shouldn't have ever been before them because it wasn't really connected to the drug conspiracy. The district court said, it's admissible, it's in front of them, they can argue- Any other piece of evidence. It's admissible, it's before them, and it's perfectly within bounds for defense counsel to argue that. What does this prove? It doesn't prove anything. It doesn't prove that it's related to the drug trade. It's not related to the drug trade. It's in there, and you should put it out of your mind. Because you're not supposed, and the judge will tell you, you're not supposed to convict because they're generally bad people. You're supposed to assess the evidence about the elements of this case, and the jury does. I think it gets back to where Your Honor started, which is the jurisdictional issue here. And I think that as Your Honor identified, and Your Honor identified, these issues are sort of interrelated. I did my best to try to isolate them, as well as connect them in my brief. But it's a bit of a nuanced and complicated argument that I admit I struggled to try to get across clearly. But I think that this is a situation where we've really gone too far. We're letting too much in in front of a jury and saying, hey, these are bad people, bad results happened here. We don't have Mr. Nina directing a single one of these violent incidents, not one. There's no incident where he says, I need to project control. Here's a gun, go take care of this. A question that he's in charge of the whole operation. Can I just ask just one other small point that's- I'm here at your pleasure. Right, the statutory rape. Apparently, your client had sex with someone that was under 16. And the judge was the one who raised this particular concern and suggested that this might be of concern. There was no objection on the part of the defense counsel at that point. Then ultimately, there's a summation in which the government mentions the fact that she was 15, but doesn't say anything about the sexual relationship. You've raised that as grounds for an objection. And my question is, how is that particularly prejudicial in light of the fact that it was the court who actually raised this concern initially? Well, again, with due respect to the trial counsel, who I think did a very good job in a difficult situation. There probably should have been a timely objection. But in any event, he did make a timely motion for a mistrial when it was raised on summation. And the government wants to say, well, they didn't actually say in summation that she was 15 and there was sex. And so they didn't make that connection right then and there. But they made the connection very, very explicitly during the trial testimony. And then the very same assistant United States attorney who elicited that testimony stood up in the opening summation for the government and almost right out of the gate said, she was 15, he was 32. And they tell us that- Wasn't there evidence, though, that he was using underage children to help sell the drugs? There was evidence that most of the people in the conspiracy were teenagers. They argued that that was somehow relevant. They never articulated why. To this day, it's not clear to me why that was relevant. There's no element in the charge that has anything to do with age of the participants. There was no argument that- Do you think that that's relevant to control? Essentially, the allegation is that your client is in control of this drug operation. To the extent that he is much older than people who are in force with him is a significant evidence of the ability to control, isn't it? It could be, your honor. That argument wasn't really expressly made at trial, but it could be. But there was no real dispute as to, there was a dispute as to whether there was all this drug dealing going on and whether he was behind it all. But there was no real dispute as to were these people working for him or working with him. And the focus was largely on the violence. So- Thank you, Mr. Ginsburg. You've reserved a couple of minutes.  Thank you for your time. From the government? May it please the court, my name is Christopher DeMacy and I represent the United States on this appeal. And I also represented the government in both trials below in this matter. There is no basis to reverse the convictions below or disturb the district court's sentence in connection with the defendant's commission. Since we ended up with the statutory rape issue, I'd like to ask a couple of questions about that. The government's brief says in hindsight the questions were not ideal. Didn't Judge Sullivan have a sort of better take on this, that this was a flagrant foul? I think what the government is trying to say in its brief is the timing of the questions was not ideal. Yeah, it was definitely not ideal because the timing of the questions, to the extent there is some issue about manipulating teenagers in the drug trade or being in control, first of all, the ages were already in the record as you argue in your brief. And the questioning was, did you have an intimate relationship with any members of the crew? Yes. And Nina? Was your relationship with Nina out in the open? No. Why not? Because it was just sex. How old were you at the time? Sixteen. Do you know how old he was? Thirty-two. Now, why on earth is that question asked at that point in the questioning, if not to tell the jury that Nina is effectively a rapist? Your Honor, the government conceded even at the trial level that the ordering of those questions was not ideal. It's not a question of not, excuse me. I mean, I may get a little agitated here because I once sat in that seat as chief appellate attorney in your office. And I would not have come to the Court of Appeals and said this was not ideal. And I don't think it's in the traditions of your office to tell me that that is not ideal. That is a bad mistake. And I'm not saying that the, you know, I've made mistakes as a trial lawyer too. I did things that a judge called me up and said, you know, you really shouldn't do that again. And I took it to heart. But you don't come to this court and say, you know, it was not ideal. There's no reason why that question should be asked in that order at that time, except to emphasize the fact that this sexual relationship is illicit and improper and negative. You know, the ages can get in there. They got in there at the summation. They were in the record otherwise. That's one thing. And if the jury, some juror puts it together, well, Nina made that bed by his behavior. And if all those facts are relevant, they're relevant. But there's no reason to ask that question at that point except to dirty up Nina with this sexual relationship. And, you know, if somebody came here and said, look, you know, this prosecutor has been told not to do that anymore. We realize this was a bad mistake. I wouldn't even be bringing it up. I just think it's the wrong thing to do to come to this court and minimize that kind of conduct. And, you know, I hope that that message gets back to your office. I understand, Your Honor, and I think we conceded at the trial level that it was a mistake. We may have used the words not ideal, but I think it was clear that we believed it was a mistake. And, in fact, I would just note that we were pushing for a limiting instruction because of the nature of the testimony, which is kind of unusual when the government elicits it in the first instance. Well, yeah, except that then I think the defense counsel is in the awkward position of deciding as a strategic matter, which I think was the decision that counsel made, and I think it was a reasonable one, that the last thing we want is to tell the jury, pay no attention to the elephant that you just saw walk through the courtroom. It's a big elephant, and it's a gray elephant, and I know you're going to be concerned about it, but really don't pay no attention to it. You know, most defense lawyers would probably say, let's just let that. Let me just make one point, Your Honor, on that issue, which is that I think there's a reasonable inference to be drawn that Mr. Ginsburg, not Mr. Ginsburg here, but Lee Ginsburg, who represented Mr. Nina in that trial, intended all along to cross-examine the witness about the sexual relationship. Oh, the sexual relationship is fine, you see. That's what makes that questioning so outrageous. It's fine to bring out her age at a different point because it's relevant to this other argument. It's fine to bring out the sexual relationship because that is something that is going to be used to impeach. Aren't you just a woman scorned or exploited, and therefore you're making stuff up? That's a possible argument, and the government can head it off. It's when you come right after the sex with the ages, which, again, are already in the record. There's no need to ask that question at all at that point. The only reason to ask that question is to say statutory rape to the jury. That's the problem. I do think it's also important to note that the jury acquitted the defendant of one of the three counts in that trial. So I think from that, and that doesn't— Fine. I'm not here to argue about—it wasn't even really raised by your adversary in the argument until the court brought it up, about whether this was harmless or whether it was prejudicial or anything else about reversal. I'm just raising the question of, A, what was done, and, B, how it was presented to this court on appeal. That's the problem I've got. Understood. I'll take that back to the office. Enough said. I'm sorry. I've taken up too much of your time. That's quite all right. Turning back to the two main issues in the case, which were discussed at length by Mr. Ginsburg, there was, as the district court actually found in an order after the trial was over in this case, there was ample evidence in the record for a rational trier of fact to conclude that at least one of the motives for this murder was the defendant's role in the drug conspiracy. That is the standard, right? It's not the primary. It is just one of the motives. Absolutely. It need not be the only motive, and this court has held that in many cases in the past. And I think what the district court says in its order is actually very telling, and I think it shows that the two arguments that the parties are making here are not mutually exclusive, that there was disrespect, as Mr. Ginsburg has argued here and in his brief, but that that disrespect, at least in some part, flowed from the dispute over drug territory that had been percolating for months before this incident. And as long as that was at least part of the motive for Ms. Morales and Mr. Nina's involvement in the shooting, that is sufficient, and as long as a rational trier of fact could come to that conclusion, that is sufficient. A broader question. In fact, you create this kind of drug community, and violence is very much a part of enforcement of the drug activity. Is there a justification to say that the violence unto itself to create an environment by which enforcement is obtained is sufficient? I think that may be true, but I think we have facts in the record in this case that actually show, contrary to what Mr. Ginsburg has said, that Adoni Nina, the defendant, had personal knowledge of the ongoing dispute related to drug territory at this location. There was testimony from several witnesses that Mr. Nina himself went to the block, confronted both Mr. Morales, who was the victim's brother and who was dealing heroin on that block, and also Mr. Vieira, along with Candido Antomati, Mr. Nina's co-leader of this drug trafficking organization. So there was evidence in the record, not just about some kind of generalized use of violence to enforce drug territory, but of Mr. Nina's personal involvement and knowledge of the ongoing drug territory dispute at 163rd and Simpson, where this ultimate argument between the three women and Ms. Morales occurred. And, in fact, at the end of the day, as Judge Sullivan points out in his order, to some extent the proof is in the pudding. The fact that she calls Nina, the leader of the drug conspiracy, to come to help her rather than somebody else, and that he brings a gun, he makes a threatening gesture himself, not Ms. Morales, but himself to these three women on the street before the shooting, and that he provides the gun and says, are you going to do this or am I going to do it? All is additional evidence the jury was entitled to consider in determining whether this was, in fact, drug-related and whether there was a drug-related motive to this murder. Can I ask you about the three incidents? Yes. Prospect Avenue shootings, Kojak shooting, bicycle incident. Was there an explicit 403 balancing decision made by the district court on that? Yes, there was, and I would point the court to pages 5 through 8 of the transcript of the first trial. There was not a written order from Judge Sullivan on these, what were actually six different incidents that were briefed by the government. As Mr. Ginsburg noted in his appellate brief, there was an argument about this at a final pretrial conference. The judge asked for additional briefing. The government provided that briefing. I saw that 403 was raised pretrial in the defendant's papers. Yes. Did the district court do anything other than say I'm denying the motion to eliminate on that? He absolutely did, and in pages 5 through 8 of the trial transcript from the first trial, the judge actually excludes two of the six incidents that the government sought to introduce on 403 grounds. He basically found that those two other incidents were not sufficiently tethered to the drug conspiracy, but also because those two incidents involved Mr. Nina himself firing guns and in fact shooting a person, one of the two, that the jury might take these two incidents that are untethered to the drug conspiracy and conclude from them improperly that this is a violent guy who has a propensity to commit violent acts. And on that basis, the court excluded two of the six and did a careful analysis of the other four to find that those were sufficiently tethered to the drug organization, involved the protection of crew property, crew members, and drug territory. So the court did a very careful analysis. Is this at appendix 66 to 69 or thereabouts? I'm going to take a look. Is that what you're referring to or is that a different trial? There is some discussion of prior bad acts there. Your Honor, those are not the pages I'm referring to, and I think this— Is this from the second trial? You know what? I'm trying to figure out the date. This was a final pretrial conference that you're referring to in the appendix. I'm actually talking about the first day of trial, the first trial in 2013, pages 5 through 8 of that transcript. We may not have that in the appendix. It may not be in the appendix, Your Honor. I'm sorry. Was somebody else asking a question? I think we're settled. Did you want to say anything else, Mr. DeMasi? No. If the court has no further questions, we would rest in our brief. Thank you. Mr. Ginsberg, you have a couple minutes. Thank you. Just two quick points. The idea that there was evidence that Mr. Niena was aware of the dispute between Caffey and Vieira and Bobby I think is a little bit misleading, not necessarily intentionally so, but misleading. I addressed it in some detail in my reply brief. There is some testimony that there were some interactions between Niena and Vieira and Niena and Bobby, but there's no indication that, first of all, when those occurred in relation to this murder or killing. There's no indication that he had any knowledge that either of those individuals was involved in any dispute with Caffey, which would then connect it up to the shooting. The fact that Caffey called Niena following the shooting also was raised by Mr. DeMasi. The evidence is that Mr. Niena and Caffey were involved in an intimate relationship and the fact that following a brutal public beating she reached out to her boyfriend I don't think is evidence that she was reaching out to her boss and there was no indication that that was the reason that she reached out to him. More generally, I would just like to emphasize that. He's her boss and her boyfriend, right? Apparently. So you would want to draw the inference that it was natural for her to go to him because he's the boyfriend and they want to draw the inference that it's natural for her to go to him because he's the boss when he is, in fact, both. Correct. But there's no indication in that instance that her calling them, her words to him were they jumped me. This group of girls jumped me. No connection to any drug conspiracy. No connection to any dispute between her and Bobby or her and Vieira. It was these girls jumped me. That, to me, is a personal affront that she sought to avenge. Thank you, Mr. Ginsberg. Thank you. We'll reserve decision in this case and we'll turn it back to you.